**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | |
|---|---|
| **NATHAN A. EVANS** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO. 21-CV-617** |
| ) | |
| **CANTOR INSURANCE GROUP, L.P.** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **Serve:** ) | |
| ) | |
| **Corporation Service Company** ) | |
| **251 Little Falls Drive** ) | |
| **Wilmington, DE 19808** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**COMPLAINT**

Plaintiff Nathan A. Evans brings this Complaint against Defendant Cantor Insurance Group, L.P. for breach of contract and alleges:

**THE PARTIES**

1. Plaintiff Nathan A. Evans recently moved to Virginia, where he now resides. Evans was a resident of Montgomery County, Maryland during almost all times relevant to this Complaint. At all times relevant, Evans served as President and CEO of Maple Life Financial, Inc., and its successor, MLF Financial Group, LLC ("MLF"), which had its offices in Montgomery County, Maryland.

2. Defendant Cantor Insurance Group, L.P. ("Cantor") is a Delaware Limited Partnership. Upon information and belief, no partner or member of Cantor resides in Maryland. Cantor's principal place of business is in New York, New York.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332. The parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    This Court has jurisdiction over Cantor because Cantor contracted and did business with MLF and Evans in Maryland.

5.    Venue is appropriate in this district and division because a substantial part of the events giving rise to the claim occurred in Montgomery County, Maryland. Cantor contracted with MLF and Evans in this district and division, and Evans performed the relevant services under contracts with Cantor and MLF in this district and division.

## FACTUAL ALLEGATIONS

6.    Prior to 2006, Evans had a primary leadership role in building the Maple Life group of companies. Maple Life Financial LLC bought life insurance policies from individual insureds and packaged those policies for sale on secondary markets. Maple Life's LexServ entity serviced insurance contracts for a fee (paying premiums, contacting individual insureds, etc.).

7.    In 2006, Reservoir Capital Group, L.L.C. ("Reservoir") acting through special purpose affiliates, bought MLF and its constituent entities. Recognizing Evans' critical role and value to Maple Life's operations, Reservoir caused MLF to sign an Employment Agreement dated March 1, 2006, with Evans ("the 2006 Employment Agreement"). That Agreement provided that "Reservoir desires to secure, for the benefit of the Corporation [MLF] the continued employment of the Executive [Evans]."  The 2006 Employment Agreement provided that MLF would pay Evans certain bonuses, including a management bonus based on percentages of MLF's annual net

income. Paragraphs 4(c) and 4(d) of the 2006 Employment Agreement provided that MLF or Evans could terminate the Agreement upon 30 days prior written notice.

**Cantor's First Oral Contract to Match Evans' Bonuses From Reservoir**

8.    Later in 2006, Cantor Fitzgerald & Co., a broker dealer incorporated and headquartered in New York, acting though its affiliate Defendant Cantor Insurance Group, L.P. ("Cantor"), bought 50% of the Maple Life LexServ business. Cantor and MLF formed a Delaware limited partnership MLF LexServ, L.P. ("MLF LexServ"), to run the LexServ servicing business. MLF signed an Administrative Services Agreement with MLF LexServ to provide employees (including a CEO) and administrative support to run the LexServ business. Paragraph 7 of the Administrative Services Agreement provided that MLF LexServ would pay MLF to run the business according to Schedule C of the Agreement. Schedule C provided that MLF LexServ would pay MLF 25% of the "aggregate salary, benefits and cash bonus paid by [MLF] to each of the three Senior Executives or their Successors." Evans was not a party to the Administrative services Agreement.

9.    Cantor and Reservoir agreed that the MLF LexServ Board would consist of a Reservoir representative, a Cantor representative, and Evans. Cantor's representative on the MLF LexServ Board, and Cantor's main point of contact with Evans and Reservoir, was Stuart Hersch.

10.    Despite MLF LexServ's obligation to pay only 25% of Evans' compensation, in recognition of Evans' skills and critical role, and as an incentive for Evans to keep working with Maple Life, Hersch promised Evans that Cantor would take the necessary steps to ensure that MLF LexServ proportionately matched all bonus compensation arrangements that Reservoir paid to Evans from the Reservoir entities. In other words, Hersch promised that Cantor would take the

necessary steps to pay from its 50% share of MLF LexServ the same share of its profits to Evans that Reservoir had agreed to pay Evans.

11.     Evans took the last step necessary to form this first oral contract with Cantor in Maryland by agreeing to Hersch's promise there. Evans relied on Hersch's representations.as part of his willingness to continue working with Maple Life.

12.     Evans fulfilled his obligations under this first oral contract by continuing to work for all of the Maple Life businesses and increasing the value of Cantor's investment in MLF LexServ.

13.     Because Evans' bonuses from Reservoir entities were conditioned upon his continued employment, and because Evans' employment with Maple Life could be terminated upon 30 days written notice, Cantor's oral contractual promise to match Reservoir's bonus payments to Evans while he was employed with Maple Life was capable of being performed within one year.

14.     Year after year, Evans provided Hersch and Cantor information about the bonus compensation he would receive from Reservoir entities. As Cantor's representative, Hersch honored Cantor's promises by taking the necessary steps to have MLF LexServ match Evans' bonus compensation formulas from Reservoir and its entities. As Cantor's representative, Hersch memorialized Cantor's promises by voting to approve MLF LexServ written resolutions paying Evans bonuses that matched the bonus formulas to Evans from Reservoir entities.

15.     Hersch left Cantor in 2017. Cantor designated James Bond as Cantor's representative on the MLF LexServ board and as Cantor's primary point of contact with the Maple Life businesses. As an MLF LexServ board member, Bond voted for board resolutions approving bonuses for Evans based on the same formulas. After Bond's departure from Cantor in 2019,

Cantor named Paul Pion as its MLF LexServ board member and point person. Pion confirmed to Evans that he was aware of Cantor's prior promises to match Evans' bonus formulas from the Reservoir entities. As an MLF LexServ board member, Pion voted for board resolutions approving bonuses for Evans based on the same formulas

**Cantor's Second Oral Contract to Match Reservoir's
Compensation to Evans in Connection with the Sale of the Maple Life Entities**

16.     Evans' performance confirmed Cantor's recognition of Evans' skills and critical role in building the LexServ business. When Cantor bought 50% of the LexServ business in 2006, MLF LexServ had less than one billion dollars in policies under management. By 2020, Evans had increased the LexServ business to $33 billion in policies under management.

17.     By 2019, Evans' leadership had made the Maple Life and Maple Life LexServ entities attractive acquisition targets. Evans, Reservoir, and Cantor all recognized that Evans' continued leadership and employment with the Maple Life businesses would be important to potential acquirers.

18.     In May, 2019, Evans signed a new Employment Agreement with Reservoir's affiliate MLF Financial Group, LLC ("the 2019 Employment Agreement"). That Agreement contemplated the potential sale of the Maple Life businesses. Paragraph 3 of that Agreement provided that Evans would receive a percentage of Reservoir's net proceeds from a sale/liquidity event.

19.     Shortly after signing the 2019 Employment Agreement, Evans had the following email exchange with Pion:

> **From:** Nate Evans
> **Sent:** Thursday, June 06, 2019 11:31 AM
> **To:** 'Pion, Paul' <PPion@cantor.com>
> **Subject:** RE: A couple things - time sensitive
>
> Paul,

I would have replied to your email yesterday, but I was so taken aback that I didn't even know how to begin to respond.
As you acknowledged last week, I have gone to great lengths to provide tremendous value to Cantor (even beyond what Cantor was entitled to receive under the operating agreement), and I did so because I was acting in good faith, on the reasonable expectation that Cantor would keep the promises that it had made to me.

My request of Cantor was nothing more than to document an agreement that has been in place for over a decade. I do not understand why I have received, and am offended by, your email that ignores this long-standing agreement. To say "it is premature to discuss at present time" is a gross mischaracterization of what Cantor knows to be our mutual understanding.

I expect Cantor to honor the commitments that it has made to me.

Nate

**From:** Pion, Paul [mailto:PPion@cantor.com]
**Sent:** Wednesday, June 05, 2019 6:31 PM
**To:** Nate Evans <nevans@MapleLF.com>
**Subject:** RE: A couple things - time sensitive

Nate

I have spoken with management and we do not acknowledge any agreement with respect to a transaction bonus for you.

We plan to connect on the allocation of purchase price with Reservoir Capital shortly.  I will keep you posted.

We will certainly consider a transaction bonus for you following the completion of a favorable transaction, but it is premature to discuss at present time.

Thanks

Paul

**From:** Nate Evans <nevans@MapleLF.com>
**Sent:** Monday, June 03, 2019 1:57 PM
**To:** Pion, Paul <PPion@cantor.com>
**Subject:** A couple things - time sensitive

Hey Paul,

Hope London is going well.

We have got to get the company sales issues resolved. (1. my deal and 2. allocation of Lex purchase price) I don't know how these things get done at Cantor. When can we talk it.

Best regards

Nate Evans
CEO
MLF Financial Group

20.     Disturbed by Pion's response, Evans wrote the following email to Howard Lutnick, Cantor's CEO:

**From:** Nate Evans <nevans@maplelf.com>
**Date:** June 7, 2019 at 3:12:38 PM EDT
**To:** "hlutnick@cantor.com" <hlutnick@cantor.com>
**Subject: Issue**

Hi Howard,

I hope this email finds you well.

It has been a little while since we have spoken, but I felt I needed to get you involved in a situation that has arisen. I received an email from Paul this week that took me completely by surprise.

My financial arrangement with Cantor has always been that Cantor will match Reservoir's contribution to my compensation (annual bonus and sale proceeds participation). This agreement has been in place for over a decade, and Cantor has always abided by this agreement.

As you may know, it looks like a company sale may occur this year. I asked Paul to simply document my long standing agreement with Cantor, so that all of the "I's" were dotted and "T's" were crossed prior to a sale. Paul's response asserts that Cantor does "not acknowledge any agreement with respect to a transaction bonus for you" an agreement which has been consistently followed for all of these years.

Since 2006 I have worked with Cantor, and we have had a great partnership. One of my major roles in managing LexServ, as part of a larger organization, has been to see that Cantor is dealt with fairly. As anyone at Cantor who has been engaged with LexServ will tell you… I have done exactly that.

Frankly I am appalled that Paul would assert such an egregious position given Cantor's and my partnership and long standing agreement. If you would, please look into this?  This is a very significant issue to me and I would like to discuss/resolve this before I move forward in the sales process. I appreciate your consideration and look forward to speaking with you.

Best regards

Nate Evans

21.     Evans informed Pion that Evans had sent the email to Lutnick:

From: Nate Evans <nevans@MapleLF.com>
Sent: Saturday, June 8, 2019 9:58 AM
To: Paul Pion <PPion@cantor.com>
Subject: Heads up

Hi Paul

I tried unsuccessfully to get you yesterday. I wanted you to give you a heads up that I sent Howard an email expressing my disappointment with Cantor's new position and requested a direct conversation with him to resolve my deal prior to a sale.

If you have time next week I have the board meeting / update ready.

Have a good weekend.


Best regards

Nate Evans


22.     Lutnick never responded to Evans' email or spoke to him directly. As various potential buyers approached Reservoir about purchasing the Maple Life business, all those potential buyers sought assurances that Evans would be willing to sign an employment agreement and continue running the Maple Life Business for any new owners. Evans had the following email exchange with Pion and Cantor merger and acquisitions executive Charles Edelman in November 2020:

From: Nate Evans <nevans@MapleLF.com>
Sent: Monday, November 18, 2019 11:03 AM
To: Paul Pion <PPion@cantor.com>
Cc: Charles Edelman (Cedelman@cantor.com) <Cedelman@cantor.com>
Subject: My deal
Importance: High

Hi Paul,

I am pinging you again because my deal still not being documented is impeding the sales process  and will bring it to halt. As we have discussed a number of times, I am not making commitments to the prospective buyers until my economics are buttoned up. Please let me know if there is something else I should be doing to get this done. At this point does it make sense for me to meet with Howard directly?

Best regards

Nate Evans

**From:** Nate Evans <nevans@MapleLF.com>
**Sent:** Wednesday, November 20, 2019 11:00 AM
**To:** Paul Pion <PPion@cantor.com>
**Cc:** Charles Edelman (Cedelman@cantor.com) <Cedelman@cantor.com>
**Subject:** My deal... Follow up
**Importance:** High

Hi Paul,

As a follow up and update to my email last week, I am having the third meeting with one of the potential buyers tomorrow. My "roll-over" and new contract terms will again be a topic.   And as I said before, until my deal is formalized and I know what my financial position will be at closing, I am unable and unwilling to discuss my equity participation with a buyer.

I'm sorry for the tight follow-up emails, but I understand the urgency of the situation and do not want to be blamed if a buyer(s) walk away from the process because of this issue.

Best regards

Nate

**From:** Pion, Paul [mailto:PPion@cantor.com]
**Sent:** Wednesday, November 20, 2019 1:33 PM
**To:** Nate Evans <nevans@MapleLF.com>
**Cc:** Edelman, Charles <CEdelman@cantor.com>
**Subject:** LexServ

Nate,

As we have discussed, given how the Maple Life sale process has unfolded, Cantor is uncomfortable attempting to discuss or negotiate any new arrangements with you with respect to our stake in LexServ until we better understand the results of the process.  As we have reviewed with you, we currently have no such arrangement with you.

Please let me address your assertion, that Cantor is somehow harming the Maple Life sale process. We are skeptical that our unwillingness to discuss or negotiate any new arrangement with you at this time is affecting the sale process, and to the extent that you claim it is an issue, it is hard to accept the fault you seem to be ascribing to Cantor as this potential payment represents a small amount of capital versus the overall transaction.

Cantor did not choose the timing, representatives or process undertaken by the company and Reservoir Capital. Cantor was asked to strike an arrangement with Reservoir Capital to permit the process to proceed without our oversight and we have done so.

You should have every confidence that my transaction team has kept Howard Lutnick fully informed about all the conversations relating to Cantor's stake in LexServ, including your repeated requests to enter into an agreement with Cantor. This is consistent with the manner in which we have kept him apprised of the annual requests for additional compensation in the form of bonus.

Cheers

Paul

23.    On December 26, 2019, Evans wrote an email to Reservoir and Cantor representatives updating them on negotiations with five companies interested in buying Maple Life. Evans noted "The sale will not move forward until Cantor formalizes the CEO sale bonus so a roll-over commitment can be made."  In response, Matt Popoli of Reservoir and Cantor had the following email exchange on December 31, 2019:

**From:** Edelman, Charles [mailto:CEdelman@cantor.com]
**Sent:** Tuesday, December 31, 2019 12:47 PM
**To:** Matt Popoli <mpopoli@insurancecap.com>; Nate Evans <nevans@MapleLF.com>
**Cc:** Pion, Paul <PPion@cantor.com>; mpopoli@reservoircap.com; Craig Huff (chuff@reservoircap.com) <chuff@reservoircap.com>
**Subject:** Re: Sale process update

Matt,
As we have posted Nate, we will address his request once we have certainty on the economics we will be receiving in the transaction.
Happy New Year.
Charles

Get Outlook for iOS

**From:** Matt Popoli <mpopoli@insurancecap.com>
**Sent:** Tuesday, December 31, 2019 9:29:33 AM
**To:** Nate Evans <nevans@MapleLF.com>; Edelman, Charles <CEdelman@cantor.com>
**Cc:** Pion, Paul <PPion@cantor.com>; mpopoli@reservoircap.com
<mpopoli@reservoircap.com>; Craig Huff (chuff@reservoircap.com)
<chuff@reservoircap.com>
**Subject:** Re: Sale process update

Thanks for the update Nate.

Charles:  What is the timing for Cantor to resolve the open issues with Nate?  Thanks.

Matt

24.    Evans believed that his emails to Pion and his email to Lutnick had documented his position, and believed that he would get confirmation of his first oral contract from Cantor when a sale was actually imminent. Evans interpreted Pion's email statement that "we will address [Evans'] request once we have certainty on the economics we will be receiving in the transaction" as consistent with that understanding.

25.    In 2020, Pion, as Cantor's representative, voted to approve MLF LexServ's payment of a bonus to Evans using the same bonus formula that the Reservoir used to calculate Evans' bonus from its entities, consistent with Cantor's first oral contract with Evans.

26.    During 2020, Longevity Holdings Inc. ("Longevity") conducted increasingly serious negotiations and due diligence to buy the Maple Life companies.

27.    Both Reservoir and Cantor wanted to sell the Maple Life companies for the sales price Longevity was contemplating. Understanding that Evans' willingness to continue running the Maple Life companies was an important factor to Longevity in the negotiations, Evans negotiated with Reservoir to receive an increased percentage of Reservoir's net proceeds from a sale in return for his willingness to continue working in the event of a sale. Reservoir and Evans ultimately agreed on a formula that resulted in Evans receiving 10.8% of Reservoir's proceeds from the contemplated sale to Reservoir.

28.    Evans then told Pion about his agreement with Reservoir. On August 28, 2020, he sent Pion emails enclosing his employment contract with Reservoir and a chart showing the percentage of its proceeds Reservoir had agreed to pay various executives. The chart showed that Reservoir would pay Evans the 7.5% in bonuses provided for in the 2019 Employment Agreement, and a separate $900,000 payment.

29.    Evans sought confirmation from Pion that Cantor would honor its first oral contract and pay Evans the same percentage of Cantor's net proceeds from the sale to Longevity.  Pion repeatedly told Evans that Cantor would make a proportionate payment to Evans, but that Cantor was unwilling to put that agreement in writing because that was not Cantor's practice.

30.    As the negotiations with Longevity approached conclusion, Reservoir took positions that Evans considered unfair to Cantor. Evans intervened to ensure that Cantor was treated fairly. As he did so, Evans reminded Pion of Cantor's long-standing promise to pay him according to the same formula that the Reservoir entities did.

31.    Because of the disputes arising between Reservoir and Cantor in connection with the sale, the two companies began negotiating a letter agreement to document the funds each company would receive upon closing with Longevity ("the Letter Agreement"). The two companies asked Evans and four other executives from the Maple Life companies to sign the letter, because the letter described specific amounts Evans and the other executives would receive at the initial closing with Longevity.

32.    Before signing the Letter Agreement, Evans again sought assurances from Pion that Cantor would honor its first oral contract to pay Evans a share of Cantor's net proceeds proportionate to the share of Reservoir's net proceeds Evans would receive. Pion told Evans that

Cantor would make a proportionate payment to Evans, but that Cantor was unwilling to put that agreement in writing.

33.    Pion's promise, on behalf of Cantor, that Cantor would proportionately match whatever Reservoir paid to Evans from the sale was both consistent with Cantor's first oral contract, and also constituted an independent contractual promise, creating a second oral contract between Cantor and Evans. Evans took the last step necessary to form this first oral contract with Cantor in Maryland by agreeing to Pion's promise there.

34.    Evans fulfilled his obligations under this second oral contract by continuing to work for all of the Maple Life businesses to consummate the sale to Longevity that Cantor desired.

35.    Because the sale to Longevity was imminent, and the escrows would close within months, this second oral contract was capable of being performed within one year.

36.    The Side Letter provided that Cantor would receive $10 million of the $30 million aggregate Cash Payment from Longevity at the initial closing of the sale. The Securities Purchase Agreement being negotiated with Longevity ("the SPA") contemplated that the sellers would place certain sales proceeds into various escrow accounts to be available to indemnify Longevity for post-closing events. The Side Letter provided that Cantor would not be responsible for contributing proceeds to the escrows, but required that Reservoir and Evans contribute to the escrows.

37.    Paragraph 3(c)(i) in the Side Letter provided that Cantor would be responsible for paying "$112,500, constituting 12.5% of Nathan A. Evans' retention bonus payment." Paragraph 5(h) of the Side Letter provided: "This Agreement, the Securities Purchase Agreement, and the other Transaction Agreements constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof."

38.     The Side Letter's "subject matter" was not to document or agree to all payments Reservoir or Cantor would make to Evans after execution of the Side Letter. Evans continued to work for Maple Life after execution of the Side Letter, receiving ordinary salary and benefits. Nor was the "subject matter" of the Side Letter to document all proceeds Reservoir would pay Evans from the sale, or Cantor's responsibility to match those payments. Reservoir had agreed to pay Evans more than just a "retention bonus payment," and Evans' total compensation from the Reservoir entities would not be complete until after release of the various escrows post-closing. Cantor's agreement in the Side Letter to pay 12.5% of the retention bonus that Reservoir would pay to Evans was part of the overall allocation of the sales proceeds between Reservoir and Cantor, an entirely different "subject matter" than Cantor's first and second oral contracts with Evans. Cantor did not make an $112,500 payment to Evans directly; that amount was netted out of the money due Cantor in the allocation of proceeds from the Longevity purchase. Tellingly, the Side Letter did not purport to release either Reservoir or Cantor from their obligations to Evans or the other executives.

39.     Paragraph 5(e) of the Side Letter provided: "Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the sole and exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if such state court declines jurisdiction, of any federal court located in Wilmington, Delaware (the "Chosen Courts") for any litigation arising out of or relating to this Agreement, or the negotiation, validity or performance hereof, or the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts), waives any objection to the laying of venue of any such litigation in the Chosen Courts and agrees not to plead or claim in any Chosen Court that such litigation brought therein has been brought in any inconvenient forum. . . ."

40.     The Side Letter did not address, arise from, or relate to, the first and second oral contracts. Evans did not intend the Side Letter to govern his rights to compensation from Reservoir or Cantor.

**Post-Closing, Pion Orally Confirmed That Cantor
Had Approved Even's Deal, but Pion Went Silent and Cantor Reneged**

41.     Thanks to Evans' role in building the Maple Life business, his willingness to continue leading the business, and his efforts to ensure that Reservoir's negotiation tactics did not result in souring Cantor on the deal, Longevity closed the deal to buy the Maple Life entities and business in September 2020.

42.     Immediately after the Longevity closing, Evans followed up with two emails to Pion:

> From: Nate Evans <nevans@MapleLF.com>
> Sent: Sunday, September 20, 2020 8:40 PM
> To: Paul Pion <PPion@cantor.com>
> Subject: Follow up
>
> Hey Paul
>
> Now that the sale is over, who should I speak to about my deal tomorrow?
>
> You/Charles/Howard?
>
>  Is everyone aware of my support of fairness to Cantor?
>
>
> **From:** Nate Evans <nevans@MapleLF.com>
> **Sent:** Wednesday, September 23, 2020 4:45 PM
> **To:** Paul Pion - Cantor (PPion@cantor.com) <PPion@cantor.com>; Edelman, Charles <CEdelman@cantor.com>
> **Subject:** Post closing discussion
>
> Good afternoon,
>
> I think I speak for everyone involved in that root canal of a sales process that it is nice to see it in the rear view mirror.

I am circling back on our earlier discussion of my deal now that the transaction has closed. Is there a convenient time for a discussion?

43.     Pion began a practice of responding to emails or text from Evans by calling Evans on the phone, instead of responding in writing. Pion orally asked for the details of what Evans would receive from Reservoir in connection with the Longevity sale. Evans responded:

**From:** Nate Evans <nevans@MapleLF.com>
**Sent:** Friday, September 25, 2020 5:30 PM
**To:** Paul Pion - Cantor (PPion@cantor.com) <PPion@cantor.com>; Edelman, Charles <CEdelman@cantor.com>
**Subject:** Nate's proceeds from waterfall

As requested…

| Partner | Investor Units | Management Units | Total Units | Total Units % | Transaction Bonuses | MLFG Proceeds | Adjustment Escrow | General Indemnification Escrow | Regulatory Escrow (non pro-rata) | Regulatory Escrow (pro-rata) | Special Indemnification Escrow | Distribution thru Waterfall (1) | Reservoir Escrow (2) | Total MLFG Distributions payable |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nate Evans | 3.475 | 195.817 | 199.292 | 5.25% | 1,350,000.00 | 1,055,451.26 | (11,821.86) | (15,762.48) | (350,000.00) | (139,235.26) | (105,083.22) | 433,548.44 | - | 1,783,548.44 |

Nate Evans

44.     Pion told Evans that he was trying to schedule a call with other Cantor executives to confirm Evans' deal, but that he was having difficulty scheduling a call. Evans sent the following texts to Pion on October 29 and November 3, 2020 [Evan's reference to an "NDA" was for an unrelated additional potential transaction]:



45.     Pion again did not respond in writing, but continued to assure Evans that Cantor

management would confirm his deal. On December 8, Evan texted Pion: "Not to be a broken

record on my deal but can you just please call Charles [Edelman] and have him approve payment

on my deal?"

46.     Pion again responded orally, assuring Evans that everyone at Cantor was "on

board" with Evans' deal. On December 21, Evans texted Pion: "Hey Paul I had a thought Given

the folks are on board . . .why not just send them an email and ask for their approval? Say if there

is no reply this week I will take it as an approval."

47. On January 7, 2021, Evans wrote an email to Pion:

**From:** Nate Evans
**Sent:** Thursday, January 7, 2021 10:45 AM
**To:** Paul Pion - Cantor (PPion@cantor.com) <ppion@cantor.com>
**Subject:** Next steps?

Hey Paul

Hope you had a good holiday

Not sure what next steps are on MAPs diligence data or my deal

If you want me to contact someone else on diligence stuff I can or can let it die

On my deal... what did you think about my idea to just send an email of what you were
going to do and ask for dissenting opinions

Nate

48. Pion stopped responding. Cantor has never paid Evans the money it owes Evans

under the first and second oral contracts.

## COUNT I
## BREACH OF FIRST ORAL CONTRACT

49. Plaintiff incorporates by reference all preceding paragraphs.

50. Plaintiff materially complied with the first oral contract.

51. Defendant Cantor breached the first oral contract by refusing to pay Evans the same

proportionate share of its proceeds from the Longevity purchase of the Maple Life entities that

Reservoir paid Evans from its share.

52. Evans has suffered damages of $975,000 as a result of Cantor's breach of the first

oral contract.

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant in an amount to be proven at trial, but not less than $975,000, plus pre- and post-judgment interest, the costs of this action, and such other and further relief that this Court deems just and proper.

## COUNT II
## BREACH OF THE SECOND ORAL CONTRACT

53.    Plaintiff incorporates by reference all preceding paragraphs.

54.    Defendant Cantor breached the second oral contract by refusing to pay Evans the same proportionate share of its proceeds from the Longevity purchase of the Maple Life entities that Reservoir paid Evans from its share.

55.    Evans has suffered damages of $975,000 as a result of Cantor's breach of the second oral contract.

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant in an amount to be proven at trial, but not less than $975,000, plus pre- and post-judgment interest, the costs of this action, and such other and further relief that this Court deems just and proper.

## COUNT III
## BREACH OF GOOD FAITH AND FAIR DEALING
## (In the Alternative)

56.    Plaintiff incorporate by reference all preceding paragraphs.

57.    To the extent that Defendant Cantor incorrectly contends that it promised only that it would "consider" paying Evans some share of its proceeds from the Longevity purchase, such a promise would constitute an oral contract capable of being performed within one year. Pion, as Cantor's representative, also put such promises in writing.

58.    Cantor breached its duty of good faith and fair dealing by refusing to truly "consider" the fairness of paying Evans an appropriate share of its proceeds from the Longevity purchase, when its principal representative and point of contact for the Maple Life business, Paul

Pion, represented that Cantor management was "on board" with the promised payment, but Cantor made false excuses for failing to schedule a meeting to approve Evans' payment and ultimately stopped responding to Evans.

59.     Evans has suffered damages of $975,000 as a result of Cantor's breach of its duty of good faith and fair dealing to consider paying Evans a fair share of Cantor's proceeds from the Longevity purchase.

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant in an amount to be proven at trial, but not less than $975,000, plus pre- and post-judgment interest, the costs of this action, and such other and further relief that this Court deems just and proper.

### COUNT II
### DECLARATORY JUDGMENT
### (That the Side Letter Does Not Require This Action to be Filed in Delaware)

60.     Plaintiff incorporates by reference all preceding paragraphs.

61.     The Side Letter did not address, arise from, or relate to, the first and second oral contracts. To the extent that Cantor contends that paragraph 5(e) of the Side Letter requires Evans to file this suit in Delaware, an actual controversy exists within this Court's jurisdiction, and Evans seeks a declaratory judgment pursuant to 22 U.S.C. 2201 that the Side Letter does not govern this action.

## JURY TRIAL DEMANDED

Plaintiff requests a jury trial on all claims.


Dated: March 10, 2021                              Respectfully submitted,


                                                 _____/s/_____
                                                 Christopher B. Mead  #08661
                                                 cmead@schertlerlaw.com
                                                 Schertler Onorato Mead & Sears, LLP
                                                 901 New York Ave., N.W., Suite 500 West
                                                 Washington, DC 20001
                                                 (202) 628-4199
                                                 (202) 628-4117 - facsimile
                                                 *Counsel for Plaintiff*