IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **NATHAN ARTHUR EVANS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 21-1618-MAK** |
| | : | |
| **CANTOR INSURANCE GROUP, LP.** | : | |

# MEMORANDUM

**KEARNEY, J.**                                                                                                                                                                                                                               **May 25, 2022**

      Many experienced business executives negotiate and sign complex documents as part of their jobs. These documents may involve selling their employer's stock or setting their compensation. We today review allegations an experienced executive signed two contracts on the same day in connection with the sale of his employer's stock to a third party which, among other things, defined the compensation owed to him from one of his employer's owners and a clause confirming he had no other oral or written agreement for additional compensation from the sale of his employer. He now brings this case seeking an additional transaction bonus based on alleged oral promises from one of the company's owners before he signed the two contracts selling his employer's stock and defining his compensation from the transaction. The oral promise for a transaction bonus to him is not in the written transaction contracts which provide him compensation and provide another executive a transaction bonus. He agreed the written contracts supersede earlier oral or written promises and the written contracts defined his compensation. He cannot ignore his signature on an integration clause in a written agreement. He cannot sue for a breach of oral contracts which he agreed are superseded by the written transaction agreements which do not pay him a transaction bonus but provide him other payments from the sale of his employer's stock. But he suggests he may have other claims so we grant him leave to timely pursue claims not barred by his signature on an integration clause if he can do so consistent with Rule 11.

I.  **Alleged facts**

Nathan Evans served in a leading role of Maple Life Financial, Inc. and its successor MLF Financial Group, LLC ("Maple Leaf") before 2006.[1] Reservoir Capital Group, LLC ("Reservoir") bought Maple Leaf in 2006.[2] It confirmed Mr. Evans's continued employment in a March 2006 employment agreement ("2006 Employment Agreement").[3] The 2006 Employment Agreement defined Mr. Evans's compensation, including payment of a management bonus based on percentages of Maple Leaf's annual net income.[4]

Reservoir then turned around later in 2006 and sold fifty percent of Maple Leaf's "LexServ" business, an entity providing insurance contract servicing, to Cantor Insurance Group, LP.[5] Cantor and Maple Leaf formed a Delaware limited partnership, MLF LexServ, LP ("LexServ"), to operate the servicing business.[6] Cantor and Reservoir agreed a three-member Board of Directors would manage LexServ with a Reservoir representative, a Cantor representative, and Mr. Evans.[7]

LexServ paid Maple Leaf to run its business under an Administrative Services Agreement.[8] It also agreed to pay twenty-five percent of the aggregate annual salary, benefits, and a cash bonus owed each year to three Maple Leaf senior executives, including Mr. Evans.[9]

*Cantor and Mr. Evans enter an oral contract for compensation in 2006.*

Cantor, through its executive Stuart Hersch, promised Mr. Evans it would proportionally match all bonus and compensation arrangements Reservoir paid him: that is, Cantor would pay Mr. Evans, from its fifty percent share of LexServ, the same share of its profits as Reservoir paid him ("First Oral Contract").[10] Mr. Evans agreed to the promised compensation.[11] Mr. Evans does not allege anyone promised him a transaction bonus or payment upon a liquidating event in this First Oral Contract.

This matching bonus and compensation agreement went on for years; Mr. Evans provided Mr. Hersch with his bonus compensation received from Reservoir and Cantor made the matching payment.[12] As a LexServ board member, Mr. Hersch also voted to approve LexServ's written resolutions paying Mr. Evans matching bonuses.[13]

Mr. Hersch left Cantor in 2017.[14] James Bond replaced Mr. Hersch as Cantor's representative to the LexServ Board.[15] Mr. Bond then voted for board resolutions approving Cantor's matching bonuses to Mr. Evans.[16] Mr. Bond left Cantor in 2019.[17] Paul Pion replaced Mr. Bond as Cantor's representative to the LexServ Board.[18]

At a November 2018 lunch attended by Mr. Pion, Mr. Hersch, and Mr. Evans, Mr. Hersch told Mr. Pion about Cantor's promise to match all bonus and additional compensation Reservoir paid Mr. Evans.[19] Mr. Pion confirmed to Mr. Evans his understanding of the agreement and later voted for board resolutions approving bonuses for Mr. Evans.[20] Mr. Evans again does not allege anyone promised him a transaction bonus or payment upon a liquidating event.

### *Mr. Evans seeks to formalize Cantor's payment of a transaction bonus from the potential sale of Maple Leaf in 2019.*

Mr. Evans signed a new employment agreement with Maple Leaf in May 2019 ("2019 Employment Agreement").[21] The 2019 Employment Agreement contemplated compensation paid by his employer from a possible sale of the Maple Leaf businesses.[22] Maple Leaf agreed Mr. Evans would receive a transaction bonus on a sale of the Maple Leaf businesses based on a specified formula.[23] . Mr. Evans does not plead a bonus arising from a sale before the 2019 Employment Agreement with his employer Maple Leaf.

Efforts to sell Maple Leaf progressed by early June 2019.[24] Mr. Evans emailed Cantor's representative Mr. Pion asking to discuss "the company sales issue … 1. My deal and 2. Allocation of Lex purchase price …."[25] Cantor, through Mr. Pion, responded Cantor "do[es] not acknowledge

3

any agreement with respect to a transaction bonus" and Cantor "will certainly consider a transaction bonus … following the completion of a favorable transaction, but it is premature to discuss at present time."[26] Displeased with Mr. Pion's response, Mr. Evans replied his request of Cantor is "nothing more than to document an agreement that has been in place for over a decade" and took offense to Mr. Pion's characterization a discussion of a transaction bonus is premature.[27] Mr. Evans directly emailed Cantor's Chief Executive Officer Howard Lutnick to complain about Mr. Pion's response and to ask Mr. Lutnick to "look into" the issue for resolution before Mr. Evans "move[s] forward in the sales process."[28] Mr. Lutnick did not respond to Mr. Evans's email.

Months passed. Mr. Evans emailed Mr. Pion as well as Charles Edelman, another Cantor executive in November 2019 to complain "his deal [is] still not being documented[,] is impeding the sales process and will bring it to a halt."[29] Mr. Evans told Cantor executives Pion and Edelman he "[is] not making commitments to the prospective buyers until [his] economics are buttoned up. …"[30] Mr. Evans later emailed Cantor executives Pion and Edelman previewing an upcoming third meeting with a potential buyer where his "'roll-over' and new contract terms will again be a topic"; "until my deal is formalized and I know what my financial position will be at closing, I am unable and unwilling to discuss my equity participation with a buyer"; and he "do[es] not want to be blamed if a buyer(s) walk [sic] away from the process because of this issue."[31] Cantor executive Pion again disavowed owing a transaction bonus to Mr. Evans.[32]

The negotiations with prospective buyers continued into late December 2019 when Mr. Evans advised Cantor's executive Edelman and Reservoir of negotiations with five companies interested in acquiring Maple Leaf. Mr. Evans told Reservoir and Cantor executives "[t]he sale will not move forward until Cantor formalizes the CEO sale bonus so a roll-over commitment can

4

be made."[33] Cantor executive Edelman responded Cantor "will address [Mr. Evans's] request once we have certainty on the economics we will be receiving in the transaction."[34]

Mr. Evans reached a belief based on these email communications with Cantor executives Pion and Edelman he "would get confirmation of his first oral contract with Cantor when a sale was actually imminent."[35] In 2020, Cantor executive Pion voted to approve LexServ's bonus payment to Mr. Evans based on the same bonus formula consistent with earlier years. Mr. Evans does not allege a discussion of a transaction bonus then.

### *A buyer for Maple Leaf emerges in 2020 and Mr. Evans continues to ask Cantor to reduce the terms of the First Oral Contract in writing.*

A bona fide buyer Longevity Holdings Inc. ("Longevity") emerged in 2020. Mr. Evans negotiated with Reservoir to receive an increased percentage of Reservoir's net proceeds from a sale of the business in return for his promise to remain working at Maple Leaf. Reservoir agreed Mr. Evans would receive 10.8 percent of Reservoir's proceeds from a sale to Longevity.

Mr. Evans then returned to Cantor. He told Cantor executive Pion about Reservoir's agreement to pay him a transaction bonus and provided his 2019 Employment Contract showing the terms of his compensation, including 7.5 percent in bonuses and a separate $900,000 payment. Mr. Evans asked Cantor executive Pion for confirmation Cantor would honor the First Oral Contract and pay him the same percentage of Cantor's net proceeds from the sale to Longevity if he facilitated the transaction by promising to work for the Maple Leaf businesses after the sale. Cantor executive Pion repeatedly told Mr. Evans Cantor will make a proportionate payment but Cantor refused to reduce the promise to writing. [36]

### *Reservoir, Cantor, and Mr. Evans sign a Side Letter Agreement on September 18, 2020 and Cantor makes a Second Oral Contract.*

Reservoir and Cantor began to disagree on issues surrounding the sale of their asset Maple Leaf to Longevity. They resolved their disputes through a letter agreement defining the payments at closing (the "Side Letter Agreement").[37] Reservoir and Cantor asked Mr. Evans and four other Maple Leaf executives to sign the Side Letter Agreement because the Agreement described specific amounts Mr. Evans and the other executives would receive on closing the Longevity sale.[38]

The preamble to the Side Letter Agreement defines Reservoir, Cantor, Mr. Evans, and four other executives as "Sellers" in connection with a Securities Purchase Agreement with Longevity.[39] Mr. Evans agreed "[i]n order to induce each of the Sellers" – including Mr. Evans – "to enter into the Securities Purchase Agreement and consummate the transactions contemplated therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers hereby agree" to certain terms including two key provisions at issue today:[40]

- "Transaction Expenses" providing Cantor "shall be responsible for the following Estimated Transaction Expenses: (1) $50,000, constituting 50% of Mario Coniglio's retention bonus payment, *plus* (2) $112,500 constituting 12.5% of Nathan A. Evans' retention bonus payment, *plus* (3) $6,250, constituting 12.5% of George Stauffer's transaction bonus payment, *plus* (4) $233,333.33, constituting 33% of Sellers' aggregate legal and advisory expenses, *plus* (5) $34,169, constituting 33% of Sellers' portion of the R&W policy premium and underwriting costs";[41] and,

- An integration clause: "This Agreement, the Securities Purchase Agreement, and the other Transaction Agreements ***constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral***, ***between the parties with respect to the subject matter hereof***."[42]

Mr. Evans again checked with Cantor before signing the Side Letter Agreement. He wanted Cantor to confirm it would pay him a share of Cantor's net proceeds proportionate to the share of

Reservoir's net proceeds from the Longevity sale.[43] Cantor executive Pion told Mr. Evans Cantor would make a proportionate payment, but Cantor remained unwilling to put the agreement in writing.[44]

Cantor never confirmed this understanding in writing. Mr. Evans repeatedly raised the transaction bonus with Cantor since his 2019 Employment Agreement. Mr. Evans along with Reservoir, Cantor, and other Maple Leaf executives, nevertheless went ahead and signed the Side Letter Agreement with the integration clause on September 18, 2020 – the same day Longevity and Reservoir, Cantor, Mr. Evans, and four executives signed the Securities Purchase Agreement to sell the Maple Leaf businesses to Longevity.[45] The Longevity deal closed on September 18, 2020.[46]

### Mr. Evans's post-sale attempts to enforce the First and Second Oral Contracts.

Mr. Evans contacted Cantor executive Pion asking about his pre-closing "deal" shortly after the signing the Side Letter Agreement and Securities Purchase Agreement.[47] Mr. Evans and Cantor executive Pion communicated over the remaining months of 2020, with Cantor allegedly assuring Mr. Evans Cantor would "confirm his deal."[48] Mr. Evans again contacted Cantor executive Pion in early January 2021 regarding the payment owed to him.[49] Mr. Pion never responded.[50] Cantor did not pay to Mr. Evans a transaction bonus from the Longevity sale. Mr. Evans does not allege whether Reservoir paid the transaction bonus separate from the Side Letter Agreement obligations.

### Mr. Evans sued Cantor in the District Court of Maryland and on Cantor's motion, the case is transferred to this District.

Mr. Evans sued Cantor in March 2021 in the United States District Court for the District of Maryland asserting a breach of the First and Second Oral Contracts by failing to pay him $975,000 representing Cantor's matching transaction bonus from the Longevity sale.[51] Cantor

7

moved to transfer, or alternatively dismiss, Mr. Evans's complaint arguing the forum selection clause in the Side Letter Agreement governs the claims and the case must be transferred to the District of Delaware. Mr. Evans opposed the motion, arguing his claims do not "depend" on, nor are they the "subject matter" of, the Side Letter Agreement making the forum selection clause inapplicable. Judge Hazel disagreed with Mr. Evans and granted Cantor's motion to transfer the action to this District.[52]

## II. Analysis

Mr. Evans filed an amended Complaint after transfer to this District.[53] He alleges Cantor breached the First and Second Oral Contracts by failing to pay him a $975,000 transaction bonus from the Longevity sale. Cantor moves to dismiss arguing the breach of the alleged oral contract claims are precluded by the Side Letter Agreement's integration clause.[54] Mr. Evans disagrees, arguing the Side Letter Agreement's integration clause does not preclude his breach of contract claims because Cantor's oral promise to pay him a transaction bonus shortly before the Side Letter Agreement is not within the "subject matter" of the Side Letter Agreement. He also argues the integration clause is "boilerplate" and limited in application by Delaware courts and is also ambiguous.

Mr. Evans agreed to an integration clause barring breach of oral contract claims. We grant Cantor's motion to dismiss without prejudice to Mr. Evans timely filing an amended Complaint alleging claims not barred by his signature on the integration clause consistent with Rule 11.

### A. The Side Letter Agreement's integration clause bars recovery for breach of an oral contract.

Both parties agree Delaware law applies to the interpretation of the Side Letter Agreement.[55] The proper construction of a contract is a question of law for the court.[56] "Delaware law 'adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which

would be understood by an objective, reasonable third party.'"[57] Our role is to "effectuate the parties' intent" and, absent ambiguity, we "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[58] The objective theory of contracts "places great weight on the plain terms of a disputed contractual provision, and 'we interpret clear and unambiguous terms according to their ordinary meaning.'"[59] An integration clause is interpreted like any other contractual provision; we interpret it according to its plain meaning when its terms are unambiguous.[60] On a motion to dismiss, we may not "choose between two differing reasonable interpretations of ambiguous documents."[61]

Extrinsic evidence is not considered unless the terms of the contract are ambiguous.[62] Where a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity.[63] A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[64] A contract is not ambiguous "'simply because the parties in litigation differ' as to the proper interpretation."[65]

Mr. Evans fails to plausibly plead a claim not barred by the integration clause.[66] First, the integration clause is not ambiguous. Its plain terms provides it and the Securities Purchase Agreement "constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof." The "subject matter" of the Side Letter Agreement is set out in the preamble: its purpose is to "induce each of the Sellers" – including Mr. Evans – "to enter into the Securities Purchase Agreement and consummate the transactions contemplated" in the Securities Purchase Agreement. There is no ambiguity here. Indeed, if the Longevity sale – effectuated through the Securities

Purchase Agreement – did not close, Mr. Evans would not have a claim to the alleged transaction bonus. Mr. Evans cannot create an ambiguity because he disagrees with the interpretation of the term "subject matter hereof" in the integration clause. The "subject matter" is not ambiguous – it is the consummation of the Longevity sale.

Mr. Evans agreed in paragraph 3.c.i. of the Side Letter Agreement to *Cantor's* obligations to pay certain transaction expenses: it obligates Cantor to pay Mr. Evans a retention bonus payment and another executive, George Stauffer, a transaction bonus payment — but no such transaction bonus payment to Mr. Evans. Mr. Evans may believe (and allege) paragraph 3.c.i. pertains only to bonuses *Reservoir* already agreed to pay its executives, but the plain language of the clause states it is *Cantor's* obligations to pay certain transaction expenses. Mr. Evans agreed to terms of the Side Letter Agreement. He did so even though it provided a transaction bonus to Mr. Stauffer but did not provide a transaction bonus to him despite his judicially admitted months of communications with Cantor executive Pion asking for his "deal" to be memorialized– a transaction bonus at closing.

The integration clause in the Side Letter Agreement is objectively clear and there is only one reasonable interpretation of it: the Agreement defines Cantor's obligations to pay certain transaction expenses to Mr. Evans and other Maple Leaf executives. A transaction bonus to Mr. Evans is not one of the obligations. The integration clause bars our consideration of a promise arising from the transaction with Longevity if not contained in the Side Letter Agreement or Securities Purchase Agreement.

We cannot discern how to except the alleged promises from the integration clause. Mr. Evans's arguments would nullify the integration clause as to a contract claim. The alleged oral promise to pay a transaction bonus is part of the same subject matter as the transaction; any other

10

result would allow a contracting party to ignore the integration clause to pursue a separate oral understanding on the same subject as the agreement with the integration clause.

### B.  Mr. Evans's boilerplate arguments do not allow him to seek a contract remedy.

Mr. Evans agreed to an integration clause barring his present claim for a breach of an alleged agreement to pay compensation from the transaction other than defined in the integrated contracts.

Mr. Evans reaches to argue the integration clause he signed in the Side Letter Agreement can be voided as boilerplate and limited in scope. He may be able to overcome the integration clause if he can show fraudulent inducement to sign the integration clause. A standard integration clause alone, without explicit anti-reliance representations and "not accompanied by other contractual provisions demonstrating with clarity that the plaintiff has agreed that [he] was not relying on facts outside the contract," will not bar a fraudulent inducement claim.[67] But Mr. Evans does not allege such a claim. In response to the motion to dismiss, Mr. Evans tells us he did not retain personal counsel in connection with the Longevity sale and counsel for Cantor and Reservoir drafted the Side Letter Agreement. He concedes he did not allege this fact.[68] He suggests "[i]f Cantor induced [him] to sign the Side Letter [Agreement] while it had a contemporaneous belief that the integration clause would preclude [him] from enforcing Cantor's promises to match Reservoir's bonuses, [he] may have grounds to bring additional claims."[69]

We do not opine today as to whether he could allege claims not barred by the integration clause. But we allow Mr. Evans leave to amend his complaint to allege fraudulent inducement if he can do so consistent with Federal Rule of Civil Procedure 11.

11

### III. Conclusion

Mr. Evans signed two agreements on September 18, 2020 where he, as a defined Seller, effected the sale of Maple Leaf to Longevity by agreeing to: sell Maple Leaf as a Maple Leaf executive in a Securities Purchase Agreement; and the manner in which the Sellers (Maple Leaf's two owners and several executives including him) would split the compensation from the Longevity transaction in a Side Letter Agreement. He agreed the Side Letter Agreement, the Securities Purchase Agreement, and the other Transaction Agreements constitute the entire agreement and supersede all earlier written and oral agreements and understandings between Cantor and him with respect to the subject matter of those agreements. The two agreements centrally addressed a transaction and compensation owed by Cantor to him after the transaction. Nothing in the September 18, 2020 agreements required anyone to pay him a transaction bonus; the Side Letter Agreement specifically required one of the owners of Cantor to pay him $112,500 constituting 12.5% of his retention bonus payment.

Mr. Evans agreed to an integration clause barring our consideration of his present claims for broken oral promises to pay him more from the sale of Maple Leaf to Longevity than he agreed on September 18, 2020. We grant Cantor's motion to dismiss without prejudice to Mr. Evans timely amending his Complaint to allege claims not barred by his agreed integration clause and consistent with Rule 11 and his sworn allegations to date.

---

[1] D.I. 22, ¶ 10.

[2] *Id.* ¶ 11.

[3] *Id.*

---

[4] *Id.*

[5] *Id.* ¶ 12.

[6] *Id.*

[7] *Id.* ¶ 13.

[8] *Id.* ¶ 12.

[9] *Id.*

[10] *Id.* ¶ 14.

[11] *Id.*

[12] *Id.* ¶ 18.

[13] *Id.*

[14] *Id.* ¶ 19.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 22 at 6. We refer to the page numbers of the amended Complaint to distinguish between two sets of misnumbered paragraphs 21 through 24 at pages 6 through 9 and pages 9 through 12.

[22] *Id.*

[23] D.I. 26–1 ¶ 3.c. at 24–25. All references to D.I. 26–1 are to the page numbers assigned by the CM/ECF docketing system.

[24] D.I. 22 ¶¶ 21–23 at 6–8.

[25] *Id.* at 6–7.

---

[26] *Id.*

[27] *Id.*

[28] *Id.* ¶ 24 at 8–9.

[29] *Id* ¶ 22 at 9. Paragraph 22 at 9 identifies the email as being sent in 2020 which we assume is a typographical error and is meant to be 2019.

[30] *Id.*

[31] *Id.* ¶ 22 at 9–10.

[32] *Id.* ¶ 22 at 11.

[33] *Id.* ¶ 23 at 11–12.

[34] *Id.*

[35] *Id.* ¶ 24 at 12.

[36] *Id.* ¶ 29.

[37] *Id.* ¶ 31. Mr. Evans's briefing refers to this agreement as both the "Letter Agreement" and the "Side Letter Agreement," seemingly interchangeably. Cantor refers to the agreement as the "Side Letter Agreement." It appears the parties refer to one document. For consistency and clarity, we refer to the document as the "Side Letter Agreement."

[38] *Id.*

[39] D.I. 26–1 at 44 (All references to D.I. 26–1 are to the page numbers assigned by the CM/ECF docketing system).

[40] *Id.*

[41] D.I. 22, ¶ 37; D.I. 26-1 at 46, ¶ 3.c.i. (emphasis in original).

[42] D.I. 26–1 at 46, ¶ 3.c.i. (emphasis added).

[43] D.I. 22 ¶ 32.

[44] *Id.* Mr. Evans alleges Cantor executive Pion's oral promise to pay him a share of Cantor's net proceeds from the Longevity transaction shortly before the September 18, 2020 closing is a "Second Oral Contract" to be enforced. *Id.* ¶¶ 32–33.

[45] D.I. 26-1 at 64.

---

[46] D.I. 22 ¶ 41.

[47] *Id.* ¶ 42.

[48] *Id.* ¶ 45.

[49] *Id.* ¶ 47.

[50] *Id.* ¶ 48.

[51] *Id.* ¶¶ 52, 55.

[52] Judge Hazel identified two relevant sections of the Side Letter Agreement: a Delaware choice of law provision and a Delaware forum selection clause providing:

> Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the sole and exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if such state court declines jurisdiction, of any federal court located in Wilmington, Delaware (the 'Chosen Courts') ***for any litigation arising out of or relating to this Agreement***, or the negotiation, validity or performance hereof, or the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts), waives any objection to the laying of venue of any such litigation in the Chosen Courts and agrees not to plead or claim in any Chosen Court that such litigation brought therein has been brought in any inconvenient forum.

D.I. 14 at 8 (quoting ¶ 5(e) of the Side Letter Agreement) (emphasis added). Considering these provisions, Judge Hazel identified the issue as whether Mr. Evans's claims for breach of the First and Second Oral Contracts fall within the forum selection clause of the Side Letter Agreement. Applying Delaware law, Judge Hazel concluded Mr. Evans's claims fall within the "arising out of or relating to" language of the forum selection clause. *Id.* at 10–13. Judge Hazel reasoned the Side Letter Agreement purported to set out the responsibilities of Reservoir, Cantor, and Mr. Evans (and other executives) regarding the allocation of proceeds and transaction expenses from the sale of Maple Leaf. Judge Hazel found Mr. Evans's claims based on an allegation he did not receive a promised transaction bonus from the Longevity sale related to the "subject matter" of the Side Letter Agreement and "contemplated" by it. *Id.* at 12. Judge Hazel noted if Mr. Evans brought a claim related to his salary – and not the Longevity transaction bonus – the Side Letter Agreement would not apply but because Mr. Evans's claim specifically relates to the allegation of sale proceeds it falls within the "relating to" language of the forum selection clause. *Id.* at 13. Judge Hazel granted Cantor's motion and transferred the case to this District. D.I. 15.

[53] D.I. 22. Mr. Evans invokes our diversity jurisdiction under 28 U.S.C. § 1332. D.I. 22 ¶ 3.

[54] D.I. 26. Cantor alternatively argues the amended Complaint fails to allege the elements for breach of an oral contract. Cantor also argues Judge Hazel's decision granting its motion to transfer Mr. Evans' complaint to this District held the claims "fall within the subject matter of the Side

Letter [Agreement]" and it is "law of the case." *See* D.I. 26 at 7, 18. We need not reach this issue because we find the plain language of the integration clause bars Mr. Evans' claims.

[55] D.I. 26 at 11; D.I. 27 at 9, n. 5.

[56] *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[57] *N. Am. Leasing, Inc. v. NASDI Holdings, LLC*, --- A.3d ---, 2022 WL 1073544, at *3 (Del. Apr. 11, 2022) (quoting *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014)).

[58] *Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 822 (Del.Ch. 2020) (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) and *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016)); *N. Am. Leasing, Inc.*, 2022 WL 1073544, at *3 (quoting *Salamone*, 106 A.3d at 368)).

[59] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, --- A.3d ---, 2022 WL 619700, at *5 (Del. Mar. 3, 2022) (internal quotation omitted) (quoting *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019)).

[60] *Focus Fin. Partners*, 241 A.3d at 823 (quoting *Barton v. Club Ventures Inv. LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013)).

[61] *Orthopaedic Assocs. of S. Del., P.A. v. Pfaff*, 2017 WL 6570028, at *5 (Del. Super. Dec. 22, 2017) (quoting *Vanderbilt Income & Growth Assocs., LLC, v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[62] *Cox Commc'ns*, *Inc.*, 2022 WL 619700 at *5 (citing *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

[63] *Exelon Generation Acquisitions, LLC*, 176 A.3d at 1267 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[64] *Cox Commc'ns, Inc.*, 2022 WL 619700 at *5 (quoting *Rhone–Poulenc Basic Chem. Co.*, 616 A.2d at 1196).

[65] *Cox Commc'ns, Inc.*, 2022 WL 6197000 at *5 (quoting *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[66] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the complaint's allegations allow us to draw the reasonable inference the defendant is liable for the alleged misconduct. *Id.*(citing *Twombly*, 550 U.S. at 556).

[67] *Addy v. Piedmonte*, 2009 WL 707641, * 19 (Del. Ch. Mar. 18, 2009) (citing *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).

---

[68] Doc. 27 at 12, n. 7.

[69] *Id.* at 11–12, n. 6.